## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE NORTEL NETWORKS CORP. SECURITIES LITIGATION<br><br>-----------------------------------------------------<br><br>*This Document Relates To*:<br><br>ALL ACTIONS | Master File No. 05 MD 1659 (LAP)<br><br>**ECF Filed** |

## MEMORANDUM OF LAW IN SUPPORT OF
## LEAD COUNSEL'S APPLICATION FOR AN AWARD OF
## <u>ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES</u>

**BERNSTEIN LITOWITZ BERGER &**
  **GROSSMANN LLP**
Max W. Berger (MB-5010)
John P. Coffey (JC-3832)
Jeffrey N. Leibell (JL-1356)
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

*Attorneys for Lead Plaintiffs*
*the Ontario Teachers' Pension Plan Board*
*and the Department of the Treasury of the*
*State of New Jersey and its Division of*
*Investment and Lead Counsel for the Class*

## TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ...........................................................................1

    A. Summary of Case Prosecution and Risks ..........................................4

    B. The Basis for the Fee and Expense Applications................................7

    C. Notice of the Fee and Expense Applications ...................................10

II. ARGUMENT ............................................................................................11

    A. The Requested Fee is Fair and Reasonable.....................................11

        1. The Percentage-Based Application Comports with
            the Legal Standards Governing Awards of Attorneys'
            Fees in this Circuit ..........................................................11

        2. The Requested Fees Are Reasonable as Measured
            by the *Grinnell* Factors ...................................................19

            a. The Time and Labor Expended by Counsel .........................19

            b. The Magnitude and Complexities of Litigation....................20

            c. The Risks of the Litigation ............................................21

            d. Quality of Representation ..............................................24

            e. The Results Achieved Justify the Requested Fee ................26

            f. Public Policy Considerations Support the Requested Fee ....28

        3. The Lodestar Cross-Check.................................................29

    B. Plaintiffs' Counsel Should Be Reimbursed For Expenses
       Reasonably Incurred In Connection With This Action....................33

III. CONCLUSION..........................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Bateman Eichler, Hill Richards, Inc. v. Berner,*
    472 U.S. 299 (1985)...............................................................................11

*Berlinsky v. Alcatel Alsthom Compagnie Generale D'Electricite,*
    964 F. Supp. 754 (S.D.N.Y. 1997).......................................................24

*Bersch v. Drexel Firestone, Inc.,*
    519 F.2d 974 (S.D.N.Y. 1975).............................................................23

*Blum v. Stenson,*
    465 U.S. 886 (1984).......................................................................12, 30

*Boeing Co. v. Van Gemert,*
    444 U.S. 472 (1980)...............................................................................11

*Camden I Condo. Ass'n v. Dunkle,*
    946 F.2d 768 (11th Cir. 1991) ..............................................................13

*Central R.R. & Banking Co. v. Pettus,*
    113 U.S. 116 (1885)...............................................................................12

*City of Detroit v. Grinnell Corp.,*
    495 F.2d 448 (2d Cir. 1974).............................................................19, 22

*Cromer Fin. Ltd. v. Berger,*
    137 F. Supp.2d 452 (S.D.N.Y. 2001)....................................................23

*Florin v. Nationsbank of Georgia, N.A.,*
    34 F.3d 560 (7th Cir. 1994) ..................................................................13

*Goldberger v. Integrated Res., Inc.,*
    209 F.3d 43 (2d Cir. 2000) ................................................5, 12, 14, 19

*Gottlieb v. Barry,*
    43 F.3d 474 (10th Cir. 1994) ................................................................13

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983)...............................................................................30

*In re AT&T Corp. Sec. Litig.,*
    455 F.3d 160 (3d Cir. 2006).......................................................................................15

*In re "Agent Orange" Prod. Liab. Litig.,*
    611 F. Supp. 1296 (E.D.N.Y. 1985),
    *aff'd in part, rev'd in part on other grounds*, 818 F.2d 226 (2d Cir. 1987) ...............14

*In re American Bank Note Holographics, Inc. Sec. Litig.,*
    127 F. Supp. 2d 418 (S.D.N.Y. 2001).................................................................12, 13

*In re BankAmerica Corp. Sec. Litig.,*
    228 F. Supp. 2d 1061 (E.D. Mo. 2002)......................................................................35

*In re Bristol-Myers Squibb Sec. Litig.,*
    361 F. Supp. 2d 229 (S.D.N.Y. 2005)............................................................5, 10, 19

*In re Cendant Corp. Litig.*
    264 F.3d 201 (3d Cir. 2001)........................................................................10, 14, 15

*In re Cendant Corp. Prides Litig.,*
    51 F. Supp. 2d 537 (D.N.J. 1999) .............................................................................33

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995)........................................................................................13

*In re Global Crossing Sec. & ERISA Litig.,*
    225 F.R.D. 436 (S.D.N.Y. 2004) .........................................................14, 15, 23, 30

*In re Lucent Techs., Inc. Sec. Litig.,*
    327 F. Supp. 2d 426 (D.N.J. 2004) .................................................................. passim

*In re McDonnell Douglas Equip. Leasing Sec. Litig.,*
    842 F. Supp. 733 (S.D.N.Y. 1994)............................................................................33

*In re NASDAQ Market-Makers Antitrust Litig.,*
    187 F.R.D. 465 (S.D.N.Y. 1998) ..................................................................... passim

*In re Rite Aid Corp. Sec. Litig.,*
    146 F. Supp. 2d 706 (E.D. Pa. 2001) ........................................................................26

*In re Sumitomo Copper Litig.,*
    74 F. Supp. 2d 393 (S.D.N.Y. 1999)........................................................13, 14, 22, 33

*In re Thirteen Appeals Arising Out of the San Juan Dupont*

*Plaza Hotel Fire Litig.,* 56 F.3d 295 (1st Cir. 1995) ...................................................13

*In re WorldCom, Inc. Sec. Litig.,*
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)................................................................. passim

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.,*
    364 F. Supp. 2d 980 (D. Minn. 2005).......................................................33

*J. I. Case Co. v. Borak,*
    377 U.S. 426 (1964)......................................................................14

*Luciano v. Olsten Corp.,*
    109 F.3d 111 (2d Cir. 1997).............................................................30

*Maley v. Del Global Techs. Corp.,*
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)..........................................12, 30, 33

*Miltland Raleigh-Durham v. Myers,*
    840 F. Supp. 235 (S.D.N.Y. 1993)...........................................33, 34

*Missouri v. Jenkins,*
    491 U.S. 274 (1989)......................................................................30

*New York State Ass'n for Retarded Children, Inc. v. Carey,*
    711 F.2d 1136 (2d Cir. 1983)............................................................30

*Rawlings v. Prudential-Bache Props., Inc.,*
    9 F.3d 513 (6th Cir. 1993) ...............................................................13

*Roberts v. Texaco, Inc.,*
    979 F. Supp. 185 (S.D.N.Y. 1997)......................................................33

*Savoie v. Merchants Bank,*
    84 F.3d 52 (2d Cir. 1996) .................................................................11

*Shaw v. Toshiba Am. Info. Sys., Inc.,*
    91 F. Supp. 2d 942 (E.D. Tex. 2000)..............................................18, 19

*Sprague v. Ticonic Nat'l Bank,*
    307 U.S. 161 (1939).......................................................................12

*Swedish Hosp. Corp. v. Shalala,*
    1 F.3d 1261 (D.C. Cir. 1993) ..............................................................13

*Torrisi v. Tucson Elec. Power Co.,*
    8 F.3d 1370 (9th Cir. 1993) ...............................................................13

*Trustees v. Greenough*,
   105 U.S. 527 (1882)..............................................................................12

*U.S. v. Afram Lines (USA), Ltd.*,
   159 F.R.D. 408 (S.D.N.Y. 1994) .........................................................23

*Wal-Mart Stores Inc. v. Visa U.S.A.*,
   396 F.3d 96 (2d Cir. 2005), *cert. denied sub nom, Leonardo's
   Pizza by the Slice Inc. v. Wal-Mart Stores Inc.*,
   544 U.S. 1044 (2005)..................................................................12, 18, 21

## DOCKETED CASES

*Di Giacomo v. Plains All Am. Pipeline*,
   Nos. H-99-4137, H-99-4212, 2001 WL 34633373 (S.D. Tex. Dec. 18, 2001) .....31, 33

*Faircloth v. Certified Fin. Inc.*,
   No. C.V.A.99-3097, 2001 WL 527489 (E.D.La. May 16, 2001) ................................31

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   No. MDL 1500 02 Civ. 5575(SWK), 2006 WL 903236
   (S.D.N.Y. Apr. 6, 2006)..........................................................................23

*In re Arakis Energy Corp., Sec. Litig.*,
   No. 95 CV 3431, 2001 WL 1590512 (E.D.N.Y. Oct. 31, 2001) ................................33

*In re Charter Comm. Inc. Sec. Litig.*,
   No. MDL 1506-4-02-V-1186 CAS, 2005 WL 4045741
   (E.D. Mo. June 30, 2005)..............................................................31, 32, 33

*In re DaimlerChrysler AG Sec. Litig.*,
   No. 00-0993 (KAJ) (D. Del. Feb. 5, 2004) ................................................19

*In re Harrah's Entm't, Inc.*,
   No. 95-2935 1998 WL 832574 (E.D. La. Nov. 25, 1998).........................................31

*In re Lloyd's Am. Trust Fund Litig.*,
   96 Civ. 1262 RWS, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ...................13, 18

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   2003 U.S.Dist. LEXIS 26795, MDL No. 1222 (CLB)
   (S.D.N.Y. June 12, 2003)..........................................................................18, 19

*In re Rite Aid Corp. Sec. Litig.*,
   No. MDL 1360, 2005 WL 697461 (E.D. Pa. Mar. 24, 2005).....................................33

*In re WorldCom, Inc. Sec. Litig.*,
No. 02 Civ. 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004)........... passim

*Schwartz v. TXU Corp.,*
Nos. 3:02-CV-2243-U, 2005 WL 3148350 (N.D. Tex. Nov. 8, 2005)......................31

## FEDERAL STATUTES

15 U.S.C. § 78u-4(a) .......................................................................................................34

15 U.S.C. § 78u-4(a)(6) ...........................................................................................13, 14

## MISCELLANEOUS

Court Awarded Attorneys Fees, Report of the Third Circuit Task Force
(Arthur F. Miller, Reporter)
108 F.R.D. 237 (3d Cir. 1985) ...............................................................13

Elaine Buckberg, Todd Foster, Ronald I. Miller, *Recent Trends in Shareholder
Class Action Litigation: Are WorldCom and Enron the New Standard?*
(NERA July 2005) ....................................................................................18

H.R. Conf. Report No. 104-369, 104th Cong., 1st Sess. (1995),
1995 WL 709276, at 32 ............................................................................8

Michael A. Perino, *Markets and Monitors: The Impact of Competition
And Experience on Attorneys' Fees in Securities Class Actions,*
St. Johns University, Legal Studies Research Paper Series,
Paper #06-0034, January 2006....................................................................16

*Ralph K. Winter, Paying Lawyers, Empowering Prosecutors, and Protecting
Managers: Raising the Cost of Capital in America,*
42 Duke L.J. 945 (1993) ......................................................................16, 17

This memorandum is submitted in support of Lead Counsel's application for an award of attorneys' fees and reimbursement of litigation expenses (the "Fee and Expense Application") on behalf of itself and other plaintiffs' counsel (collectively, "Plaintiffs' Counsel") whom, with the prior approval of the Court-appointed lead plaintiffs, Ontario Teachers' Pension Plan Board and the Department of the Treasury of the State of New Jersey and its Division of Investment ("Lead Plaintiffs"), assisted in the prosecution on behalf of the Class.[1]   For the reasons set forth herein, Lead Counsel respectfully requests that the Fee and Expense Application be approved.

## I.  PRELIMINARY STATEMENT

Lead Plaintiffs and Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), achieved an historic settlement (the "Settlement") of all claims asserted in this action ("Nortel II" or the "Action") against Nortel Networks Corporation ("Nortel" or the "Company") and certain of its former officers and directors for alleged violations of the federal securities laws during the Class Period.  If approved, the Settlement will resolve all claims asserted in this Action.

The Settlement was reached with the assistance of the Court-authorized mediator, United States District Judge Robert W. Sweet, and was part of a global settlement (the "Global Settlement") of this Action and a previously filed class action against Nortel and certain of its former officers and directors for alleged violations of the federal securities laws during the period October 24, 2000 through February 15, 2001, inclusive ("Nortel I").  The components of the Global Settlement obtained for the Nortel II Class include:

---

[1]     The "Class" is defined as all persons or entities, with certain defined exceptions, who purchased Nortel common stock, or who purchased call options on Nortel common stock, or wrote (sold) put options on Nortel common stock during the period between April 24, 2003 through April 27, 2004, inclusive (the "Class Period"), and who were damaged thereby.

- $290 million in cash from Nortel, which is 50% of the $580 million in cash Nortel paid in the Global Settlement, and represents a substantial amount both of the Class's recoverable damages and of Nortel's available financial resources;

- 314,333,875 freely-tradable shares of Nortel common stock, which is 50% of the 628,667,750 shares Nortel will pay in the Global Settlement, an unprecedented 14.5% of the Company's outstanding shares;

- cash payments of $79,995,000 from Nortel's insurance carriers, which includes $66,495,000 of insurance from policies that were presumed to cover only the claims in Nortel I;

- 25% of any recovery Nortel may obtain in litigation it is prosecuting against certain of its former senior officers; and

- substantial corporate governance improvements designed to enhance the value of the Class' new equity in the Company and to protect Nortel shareholders against any recurrence of fraudulent behavior.

On February 7, 2006, the date the terms with Nortel were reached, the value of the Settlement was approximately $1.32 billion, which is the fifth largest securities class action recovery since passage of the Private Securities Litigation Reform Act of 1995 (the "PSLRA").[2]

The prosecution of this Action was undertaken by Plaintiffs' Counsel on an entirely contingent basis. As described below, in fulfilling our duties and obligations as Lead Counsel over the past two years, we, together with Plaintiffs' Counsel, have incurred millions of dollars of expenses, and spent almost 60,000 hours prosecuting this case – time and expenses that we knew would not be compensated or reimbursed unless and until we achieved a recovery for the Class.

---

[2]    The value of the Settlement as announced was based on the $3.02 per share market price of Nortel common stock on February 7, 2006. In the Notice of Pendency and Certifications of Class Actions and Proposed Settlements, Motions for Attorneys' Fees and Settlement Fairness Hearings (the "Notice"), the Class was advised, based on the $2.24 per share market price of Nortel common stock on June 29, 2006, the date the Preliminary Approval Order was entered, that the value of the Settlement was $1.074 billion. Based on the $2.14 per share price on September 1, 2006, the value of the Settlement was $1.043 billion.

Lead Counsel is applying for fees equal to 8.5% of the settlement consideration (net of Court-approved litigation expenses), that is, $31.2 million in cash and 26,718,379 shares of Nortel common stock (which, using the September 1, 2006 market price for Nortel common stock of $2.14 per share, is valued at $57.2 million), together with interest at the same rate as earned by the Settlement Fund.  Lead Counsel also seeks reimbursement of litigation expenses of $3 million.[3]

The Fee and Expense Application represents a 32% reduction from the 12.5% fee percentage permitted under the terms of a retainer agreement (the "Retainer Agreement") that was negotiated at arm's-length at an early stage of the litigation with Lead Plaintiffs, two sophisticated institutional investors with experience as lead plaintiffs in securities class actions and in retaining and negotiating fees with counsel.  Lead Plaintiffs, who were intimately involved in every material aspect of the prosecution and mediation of the Action, negotiated that substantial reduction after the terms of the Settlement were reached and those outstanding results could be evaluated in light of the actual risks of the litigation and the time and effort Plaintiffs' Counsel devoted to the Action.  The resulting Fee and Expense Application is wholeheartedly endorsed by Lead Plaintiffs.  Declaration of John P. Coffey in Support of Proposed Settlement, Plan of Allocation and Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Coffey Declaration") ¶ 72; Joint Declaration of Michael Padfield and C. Judson Hamlin ("Lead Plaintiffs' Declaration") ¶ 19.

---

[3]   Using the $1.074 billion value of the Settlement as disclosed in the Notice, Lead Counsel's fee request would be approximately $91 million, comprised of $31.2 million in cash (net of litigation expenses) and $59.8 million in Nortel common stock.

A.     **Summary of Case Prosecution and Risks**

From the outset of this litigation, when Lead Counsel committed to prosecute this complex class action on a fully contingent basis, Lead Counsel faced numerous risks which presented the significant possibility that no (or no substantial) recovery might be obtained.  *See* Coffey Decl. ¶ 1.   Nevertheless, Lead Counsel and Plaintiffs' Counsel have vigorously prosecuted this Action for over two years, employing innovative strategies that were designed to, and did, accelerate the resolution of the Action, save judicial and party resources, and result in an outstanding recovery for the Class.  *See* Coffey Decl. ¶¶ 28-43; 46-47.

**Lead Counsel's Vigorous Prosecution of the Action**

By the time the Settlement was being submitted for approval, among numerous other tasks, Lead Counsel had: (a) conducted an extensive investigation, which included interviews of over thirty witnesses; (b) filed the Consolidated Class Action Complaint (the "First Amended complaint"), which included allegations based on non-public information developed through Lead Counsel's investigation; (c) filed Lead Plaintiffs' Second Amended Consolidated Class Action Complaint (the "Second Amended Complaint"), which alleged for the first time certain material facts regarding the evidence of improper accounting known to members of the Audit Committee of Nortel's Board of Directors (the "Audit Committee Defendants"); (d) sought and obtained key documents relating to the fraud at Nortel by successfully negotiating with Defendants to withdraw their motions to dismiss and promptly commence discovery; (e) conducted a targeted review and analysis of more than ten million pages of documents produced by Defendants; (f) comprehensively briefed Lead Plaintiffs' motion for class certification; (g) retained and extensively consulted with experts to estimate the Class' (and the Nortel 1 class') damages, to evaluate Nortel's executive compensation policies, to advise on the

telecommunications industry and Nortel's position in it, to consult on the complex accounting matters at issue, and to analyze Nortel's ability to fund the Global Settlement; (h) requested leave to move for summary judgment based on the fruits of their targeted document review; (i) engaged in protracted, arm's-length settlement negotiations with Ontario Public Service Employees' Union Pension Plan Trust ("OP Trust"), the lead plaintiff in Nortel I, and with Nortel (in which the Class' negotiating leverage was enhanced by Lead Plaintiffs' request for leave to seek summary judgment against the Company); (j) engaged in contentious, arm's-length negotiation with the Company's insurance carriers; (k) evaluated Nortel's complex insurance coverage for Nortel I and Nortel II; and (l) when Nortel's ability to fund an adequate cash settlement proved lacking, worked with the investment banking experts to devise and incorporate a substantial equity component into the Global Settlement to maximize the Class's recovery. *See* Coffey Decl. ¶ 9.

### The Significant Risks to Achieving a Substantial Recovery

When Lead Plaintiffs were appointed and Lead Counsel committed to prosecuting this Action, there existed numerous risks inherent in the prosecution of Nortel II. *See In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 234 (S.D.N.Y. 2005) ("[I]t is well-settled that the risk of the litigation must be measured as of when the case is filed.") (citing *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 55 (2d Cir. 2000)).  These risks are set forth in the Coffey Declaration (¶¶ 1, 80-90) and in the accompanying Memorandum of Law in Support of Final Approval of the Settlement and the Plan of Allocation and Certification of the Class for Settlement Purposes at pp. 17-20.

The specific circumstances at issue in this Action presented substantial risks beyond those present in other class actions prosecuted on a contingency basis under the exacting

standards of the PSLRA.  In particular, from the outset it was apparent that Nortel, the primary

defendant, was in precarious financial condition and lacked the ability to satisfy a multi-billion

dollar judgment or to independently fund a meaningful cash settlement.  Coffey Decl. ¶ 84.  At

the same time, the class in Nortel I was competing for the same limited pool of Nortel assets.  *Id.*

¶ 85.  And while the actual details of Nortel's insurance policies were not available to Lead

Counsel at the outset of the Action, Lead Counsel was aware that any insurance policies that

might pertain to the claims asserted in both Nortel I and Nortel II were limited and wasting as the

Nortel I case proceeded and, worse, that as a result of the pendency of Nortel I, Nortel may have

less insurance coverage for conduct occurring after the end of the class period in Nortel I.  *Id.* ¶

85.  Indeed, as Lead Counsel anticipated, the division of Nortel's limited pool of cash and

available insurance was a primary focus of settlement negotiations.  *Id.* ¶ 54.

As a result of Nortel's financial condition and the pendency of Nortel I, Lead Plaintiffs

retained experts both to analyze the damages incurred by the Class and the Nortel I class, as well

as to evaluate Nortel's ability to pay.  After considering Nortel's financial condition and the

insurance coverage available to satisfy Lead Plaintiffs' claims against the Company and the

Officer Defendants, it became clear that Nortel could not satisfy a judgment at trial representing

even a modest portion of the Class' damages, and that the Officer Defendants lacked the

financial wherewithal to meaningfully contribute to a settlement.  Protracted litigation thus

presented the risk of obtaining an uncollectible judgment or of bankrupting the Company, while

simultaneously depleting any available insurance coverage.

Lead Counsel also faced the risk that the Court would determine that, under the federal

securities laws, it lacked subject matter jurisdiction over the claims of non-U.S. citizens who

transacted in Nortel common stock and put and call options on the Toronto Stock Exchange.

Coffey Decl. ¶ 86.   Although the Ontario Teachers Pension Plan Board had recently (and successfully) litigated this very issue as the lead plaintiff in the *Cable & Wireless* action in the Eastern District of Virginia, the determination of subject matter jurisdiction is extremely fact specific, and accordingly, was anything but assured.   This risk loomed large because Nortel was among the most widely held companies in Canada, and, therefore, an unfavorable result could have severely restricted the size and composition of the Class.   *Id.*

The fact that Defendants and key non-party witnesses, including Nortel's auditor, the Canadian arm of Deloitte & Touche, were foreigners presented additional risks.   Coffey Decl. ¶ 88.   That these and other key witnesses, including dozens of current and former Nortel employees, were foreign and therefore not subject to U.S. discovery presented the further risk that Lead Counsel might be unable to obtain the evidence necessary to prove the Class's claims at trial.   *Id.*

It was in the face of these significant risks (and others) that Lead Counsel achieved the $1.32 billion recovery.   The Settlement – which includes a cash and equity contribution from the Company that reflects the maximum possible payment based upon the analysis of Lead Plaintiffs' (and the Nortel I lead plaintiff's) experts, virtually all of the available insurance, including a substantial payment from insurance presumed to be available only in Nortel I, and far-reaching corporate governance improvements – represents the greatest possible recovery for the Class in light of the primary defendant's inability to satisfy a judgment against it.

## B.   The Basis for the Fee and Expense Applications

Lead Counsel is applying for attorneys' fees for Plaintiffs' Counsel equal to 8.5% of the Settlement Amount (net of Court-approved litigation expenses and *pari pasu* with the Class' mix of cash and shares), and for reimbursement of approximately $3 million of out-of-pocket

expenses incurred by Plaintiffs' Counsel in connection with the prosecution of the Action.  As discussed in the Coffey Declaration (¶¶ 69-71) and the Lead Plaintiffs' Declaration (¶¶ 17-19), that fee request is a result of three separate arm's-length negotiations with Lead Plaintiffs.

At an early stage of the litigation, Ontario Teachers and New Jersey, two sophisticated institutional investors with a significant financial stake in the outcome of the litigation, entered into the Retainer Agreement with Lead Counsel.[4]  *See* Lead Plaintiffs' Decl. ¶ 17 & Ex. 1.  The fee schedule in the Retainer Agreement takes into account both the amount of the recovery obtained for the Class (using a declining percentage as the recovery increases) and the stage of the litigation at which a resolution is reached (using a sliding scale whereby the fee increases as the litigation progresses from the pleading and discovery stages to trial and appeals).  Because the Settlement was achieved during discovery, Lead Counsel was permitted under the Retainer Agreement to request fees of approximately 12.5% of the recovery.[5]  At the time the Retainer Agreement was negotiated, Lead Plaintiffs were familiar with the strengths and weaknesses of this case, including the risks of litigation and achieving a recovery.

As set forth in the Lead Plaintiffs' Declaration (¶ 18) and the Coffey Declaration (¶¶ 11, 69-72), after the parties agreed to the terms of the Settlement, and while the Notice to class members was being drafted, Lead Plaintiffs re-evaluated the amount of fees permitted under the

---

[4]     These Lead Plaintiffs are what Congress envisioned as the paradigm fiduciaries for the Class.  As the Court is aware, Congress enacted the PSLRA in large part to encourage sophisticated institutional investors to assume control of securities class actions to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel."  *See* The "Private Securities Reform Act of 1995," H.R. Conf. Report No. 104-369, 104th Cong., 1st Sess. (1995), 1995 WL 709276, at *32. Congress believed that institutions would be in the best position to monitor the ongoing prosecution of the litigation and to assess the reasonableness of counsel's fee request.  *See also In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 2591402, *20 (S.D.N.Y. Nov. 12, 2004).

[5]     The terms of the fee grid are set forth in the Lead Plaintiffs' Declaration at ¶ 17.

Retainer Agreement and negotiated a reduction of at least 20% from the 12.5% fee (that is, to no more than 10%, subject to further discussion before a fee request was filed).  Lead Counsel agreed and the Notice informed Class members of the fees that Lead Counsel could have requested under the Retainer Agreement and of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 10% of the Settlement Fund (subject to Lead Plaintiffs' consent), and for reimbursement of Plaintiffs' Counsel's litigation expenses in an amount not to exceed $4.3 million.  Coffey Decl. ¶ 70.

In their review and evaluation of the papers in support of the Settlement, Plan of Allocation and the Fee and Expense Application, Lead Plaintiffs once again evaluated what, in their opinion, was a fair and reasonable fee for Plaintiffs' Counsel.  *See* Coffey Decl. ¶ 71.  In this final assessment, balancing the result obtained in the face of the aforementioned challenges and risks of nonpayment with the fact that the Action was resolved at an early stage, before depositions were taken and the class certified, Lead Plaintiffs and Lead Counsel agreed that Lead Counsel would further reduce its fee request to 8.5% of the recovery, net of Court-approved litigation expenses.  *Id.*  With this additional reduction, Lead Counsel's request for an award of attorneys' fees is 32% (or approximately $41.6 million (using the September 1, 2006 share price)) less than the fees that would have been permitted under the Retainer Agreement.

Evaluating Plaintiffs' Counsel's work now, with a full appreciation for the aggressive and innovative strategies Lead Counsel employed and the resulting efficiencies to the Class, Lead Plaintiffs are in a position to determine that the fee request is fair and reasonable to the Class.  As more fully set forth below, the fact that Lead Plaintiffs have approved and recommended the fee request should be given considerable weight.  As the Third Circuit held in *In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001), a fee approved by a lead plaintiff is presumptively

reasonable:  "Courts should afford a presumption of reasonableness to fee requests submitted pursuant to an agreement between a properly-selected lead plaintiff and properly-selected lead counsel."  *Accord In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 433-34 (D.N.J. 2004).  In addition, the percentage requested and approved by Lead Plaintiffs – 8.5% of the recovery net of Court-approved litigation expenses – is well below the norm in securities law cases of this type, even in so-called "mega-fund" cases, and is fair and reasonable when viewed in light of the considerable lodestar Plaintiffs' Counsel have amassed.  While the fee awarded in a particular action must be based on the facts unique to that litigation, *see*, *e.g.*, *Bristol-Myers*, 361 F. Supp. 2d at 236, comparison to the fees awarded in comparable complex class actions demonstrates that the fee requested here is within the range of awards found to be reasonable.

As demonstrated below, the facts unique to this litigation, including the significant risks facing Lead Counsel from the outset of the litigation, warrant the approval of the requested fee.

**C.**     <u>**Notice of the Fee and Expense Applications**</u>

Pursuant to this Court's June 29, 2006 Order (the "Preliminary Approval Order"), the Notice has been mailed to 851,945 potential Class Members beginning on July 21, 2006.  *See* Affidavit of Neil L. Zola, attached as Exhibit 3 to the Coffey Declaration, ¶33.  Further, in accordance with the Preliminary Approval Order, the Notice of Pendency of Class Action, Hearing on Proposed Settlement and Attorneys' Fee Petition and Right to Share in Net Settlement Fund was published in the U.S. and, accordance with the notice plan approved by the Court, in a variety of Canadian business and other publications, periodicals and magazines, as well as in banners on the internet.  *Id.* ¶ 2.  Information regarding the Settlement, including downloadable    copies    of    the    Notice    and    Claim    Form,    was    posted    on <u>www.nortelsecuritieslitigation.com,</u> the website dedicated to the Global Settlement, and was

available through the Claims Administrator's website, www.gardencitygroup.com, and Lead Counsel's website, www.blbglaw.com.  Coffey Decl. ¶ 61.  While the time to object does not expire until September 19, 2006, to date no Class Member has filed an objection to the Fee and Expense Application.  *Id.* ¶ 91.

## II.  ARGUMENT

### A.  The Requested Fee is Fair and Reasonable

#### 1.  The Percentage-Based Fee Application Comports with the Legal Standards Governing Awards of Attorneys' Fees in this Circuit

It is well-settled that attorneys who represent a class and achieve a benefit for class members are entitled to be compensated for their services.  The Supreme Court has recognized that "a lawyer who recovers a common fund for the benefit of persons other than ... his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Savoie v. Merchants Bank*, 84 F.3d 52, 56 (2d Cir. 1996).  The Supreme Court has further emphasized that private securities actions, such as the instant action, provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'"  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (quoting *J. I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)).

The Second Circuit has recently confirmed that counsel who creates a substantial benefit for a class is entitled to a commensurate award of fees.  In *Wal-Mart Stores Inc. v. Visa U.S.A.,* 396 F.3d 96, 122 (2d Cir.), *cert. denied sub nom, Leonardo's Pizza by the Slice Inc. v. Wal-Mart Stores Inc.,* 544 U.S. 1044 (2005), the Court of Appeals noted that fees may be awarded under either the lodestar or percentage of the fund methods, but that "the trend in this Circuit is toward the percentage method."  This is consistent with the line of cases in which the Supreme Court held that in the case of a common fund, the fee awarded should be determined on a percentage-

of-recovery basis.  *See Trustees v. Greenough*, 105 U.S. 527, 532 (1882); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 124-25 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-70 (1939).  In *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984), the Supreme Court stated that "under the 'common fund doctrine,' ... a reasonable fee is based on a percentage of the fund bestowed on the class …."  This is also consistent with the trend of district courts within this Circuit to utilize the percentage of recovery approach when calculating attorneys' fees in common fund cases.  *See, e.g., Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) ("the trend within this Circuit is to use the percentage of recovery method to calculate fee awards to class counsel" in common fund cases); *In re American Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 431 (S.D.N.Y. 2001) (same).

In his opinion in *In re Lloyd's American Trust Fund Litig.*, 96 Civ. 1262, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002), Judge Sweet, who awarded class counsel 28% of the settlement fund using the percentage method, noted:

> The percentage method directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system.  The percentage approach is also the most efficient means of rewarding the work of class action attorneys, and avoids the wasteful and burdensome process – to both counsel and the courts – of preparing and evaluating fee petitions, which the Third Circuit Task Force described as "cumbersome, enervating, and often surrealistic."

*Id*. at *25 (quoting "Court Awarded Attorney Fees," Report of the Third Circuit Task Force (Arthur F. Miller, Reporter) *reprinted in* 108 F.R.D. 237, 258 (3d Cir. 1985)).[6]  In addition, the

---

[6]     For many years, courts within this Circuit recognized that "[s]upport for the lodestar/multiplier approach in common fund cases has eroded, and there has been a 'groundswell of support for **mandating** a percentage-of-the-fund approach' in the common fund cases."  *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 397 (S.D.N.Y. 1999) (citation omitted, emphasis in original); *accord In re NASDAQ*, 187 F.R.D. at 465, 489 (S.D.N.Y. 1998) (chronicling and discussing strong support for percentage of recovery method).  The trend among circuit courts is to utilize the percentage of recovery method, which has been expressly adopted

PSLRA implicitly supports the use of the percentage of the fund method.  *See* 15 U.S.C. § 78u-4(a)(6) ("[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class").

From a public policy perspective, the percentage method is the most efficient means of compensating the work of class action attorneys.  It does not waste judicial resources analyzing thousands of hours of work, where counsel obtained a superior result.  *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1296, 1306 (E.D.N.Y. 1985) (criticizing lodestar approach as one that "tends to encourage excess discovery, delays and late settlements, while it discourages rapid, efficient and cheaper resolution of litigation"), *aff'd in part, rev'd in part on other grounds*, 818 F.2d 226 (2d Cir. 1987); *accord Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49 (2d Cir. 2000) (comparing lodestar analysis to "resurrect[ing] the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits").  In addition, a percentage method is consistent with and, indeed, is intended to mirror, practice in the private marketplace where contingent fee attorneys typically negotiate percentage fee

---

in the vast majority of circuits (the First, Third, Sixth, Seventh, Ninth, Tenth, Eleventh and District of Columbia Circuits) as an appropriate method for determining an award of attorneys' fees.  *See In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 (1st Cir. 1995) (permitting use of percentage method; "Contrary to popular belief, it is the lodestar method, not the [percentage] method, that breaks from precedent."); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821-22 (3d Cir. 1995); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994) (authorizing percentage and holding that use of lodestar/multiplier method was abuse of discretion); *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 564-65 (7th Cir. 1994) (percentage approach is appropriate in common fund case); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376-77 (9th Cir. 1993) (percentage approach appropriate); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 515-16 (6th Cir. 1993); *Swedish Hosp. Corp., v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993) ("a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); *Camden I Condo. Ass'n. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) (percentage approach applicable).

arrangements with their clients.  *See American Bank Note*, 127 F. Supp. 2d at 432 (citing *In re Sumitomo*, 74 F. Supp. 2d at 397).

The fee request here is based on the percentage method because that is what Lead Plaintiffs chose as the method for determining the fees that Lead Counsel could seek.  Since passage of the PSLRA, courts have found such an agreement between fully informed lead plaintiffs and their counsel to be presumptively reasonable.  *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001); *accord In re Lucent,* 327 F. Supp. 2d at 433-34; *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004) (Lynch, J.) (citing *Cendant* for the proposition that "in class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable").  The Third Circuit stated in *Cendant* that passage of the PSLRA "shift[ed] the underpinnings of our class action attorneys' fees jurisprudence in the securities area."  264 F.3d at 276, 282.[7]

---

[7]  *See also id.* at 276 (in enacting the PSLRA, Congress expressed its strong belief that an institutional lead plaintiff would be in a better position than the court to protect the interests of the class by monitoring lead counsel throughout the litigation and by negotiating a reasonable fee for counsel's representation).  As the Third Circuit in *Cendant* stated:  "[U]nder the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel . . .  This presumption will ensure that the lead plaintiff, not the court, functions as the class's primary agent vis-à-vis its lawyers."  *Id.* at 282; *accord Global Crossing*, 225 F.R.D. at 468 & n.16 (quoting Professors Geoffrey Miller of NYU Law School and Arthur Miller of Harvard Law School, "both of whom have significant expertise in securities class action settlements and attorney fee awards," for the proposition that such fee agreements are "prima facie evidence of the reasonableness of a fee calculated according to its terms," and that such negotiations are "precisely the type of bargaining that the PSLRA anticipated and to which a court reasonably may give substantial deference"); *see also In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 169 (3d Cir. 2006) (affirming reasonableness of fees awarded by district court, and emphasizing that the presumption of reasonableness afforded to retainer agreements between properly selected lead plaintiffs and properly selected lead counsel does not diminish court's responsibility to closely scrutinize fee arrangements).

In the recent *WorldCom* litigation, the court emphasized the importance of having institutional lead plaintiffs endorse the fee application submitted by class counsel. *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004). There, Judge Cote noted that public policy considerations supported the award, as the lead plaintiff, a large public pension fund, had "conscientiously" supervised the work of lead counsel, and had given its endorsement to the fee request, which adhered to the fee agreement. *Id*. at *20. Here two experienced public pension funds were intimately involved in all significant aspects of the prosecution and mediation of the Action, and not only negotiated a below-"benchmark" fee agreement at an early stage of the case but then negotiated a material reduction in counsel's fee after evaluating the actual efforts put forth, and the results obtained, by Plaintiffs' Counsel.

Recent academic analysis has demonstrated that institutional investors, and in particular public pension funds, have effected a reduction in the fees awarded to class counsel. Michael A. Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions*. St. John's University, Legal Studies Research Paper Series, Paper #06-0034, January 2006.[8] Professor Perino observed that the emphasis on institutional investors inherent in the PSLRA created a competitive environment in which plaintiffs' attorneys were

---

[8]    Professor Perino surveyed data on over 200 hundred cases litigated between 1997 and 2005, following enactment of the PSLRA.  He noted (at p. 14) that the gradual increase in institutional investors serving as lead plaintiffs during the period allowed for the analysis of the impact of increased institutional participation on attorneys fees.

> While institutions were initially slow to take up Congress's invitation to become lead plaintiffs, institutional participation has increased in recent years. PricewaterhouseCoopers (2003) found that less than 3% of the cases filed in 1996, the first year of litigation under the PSLRA, had either a public or union pension fund as a lead plaintiff. By 2002, 58 cases (or about 27% of the total cases filed) had such a fund as a lead plaintiff. This increase in institutional participation means that there are sufficient settlements with institutional leads to test empirically whether such participation is correlated with lower fees.

forced to compete to be retained by such institutions, in part by agreeing to reduced fee agreements. *Id.* at 2. Indeed, Professor Perino found that "[t]here is significant negative correlation between public pension fund participation as a lead plaintiff and both fee requests and fee awards." *Id.* Specifically, Professor Perino concluded, "The mean fee in cases with public pension fund plaintiffs (.1998) was significantly lower than cases with other types of lead plaintiffs (.2713)." *Id.* at 21.[9] As a result of these statistically-based conclusions, Professor Perino argues that courts overseeing securities class actions in which a public pension fund is not serving as lead plaintiff should look to the types of fee agreements entered into by public pension funds as lead plaintiffs in other securities class actions for guidance in awarding attorneys fees. *Id.* at 29.[10]

The same logic supports the conclusion reached in *WorldCom*. There, Judge Cote found that "[w]hen class counsel in a securities lawsuit have negotiated an arm's-length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close supervision of the litigation, the court should give the

---

[9]     This recent research demonstrates the achievement of one of the PSLRA's primary goals: to have sophisticated lead plaintiffs with the commitment, experience and resources to supervise lead counsel's prosecution of complex securities class actions replace "figurehead" lead plaintiffs incapable of or uninterested in exerting control over lead counsel. *Compare, e.g.*, Ralph K. Winter, *Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America*, 42 Duke L.J. 945, 984 (1993). Professor Perino's comprehensive study shows that institutional investors, and public pension funds in particular, do not serve as mere "figureheads" but, in fact, introduce true competition into the legal marketplace, and negotiate substantially reduced fee agreements for the benefit of the classes they represent.

[10]     Professor Perino explains (at p. 29):

First, the fee arrangements that public pension funds negotiate appear to be the product of at least some competitive bargaining. . . . These fee arrangements appear to give courts a true market test for the rate necessary to retain a qualified attorney to litigate a meritorious case.

terms of that agreement great weight." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 353 (S.D.N.Y. 2005).[11]

Judge Cote's analysis in approving the fees requested in connection with the *WorldCom* settlements is particularly instructive on the roles sophisticated institutional investors properly play as lead plaintiffs and the resulting deference their judgments on fees should be accorded.  In *WorldCom*, as here, the lead plaintiff was a large public pension fund that suffered substantial losses as a result of the alleged wrongdoing, and that was "actively involved in overseeing every aspect of the litigation."  *See* 388 F. Supp. 2d at 356.  The *WorldCom* lead plaintiff "did not shy away from exercising its negotiating power to rein in attorneys' fees," the terms of which were finalized after the occurrence of certain significant events such that "[t]he risks and rewards of the litigation were therefore clearer than they would have been at the inception of the lawsuit, further informing negotiations regarding the fee grid."  *Id.*  Judge Cote then determined that "[a]ll these facts weigh in favor of abiding by the Retainer Agreement."  *Id.*  Here, just as the lead plaintiff in *WorldCom*, Lead Plaintiffs revisited the amount of attorneys' fees they would approve after they fully understood "the risks and rewards" of the litigation, and wholeheartedly endorse the agreed-upon, and reduced, request.  Coffey Decl. ¶ 72; Lead Plaintiffs' Decl. ¶ 19.[12]

---

[11]     As noted in their joint declaration, Ontario Teachers estimated that it lost almost $36 million in its Nortel investment, while New Jersey estimates in losses in the millions.  Lead Plaintiffs' Decl. ¶ 4.

[12]     As set forth in question 17 of the Notice (attached as Exhibit A to the Zola Affidavit), counsel who filed the companion class actions pending in Ontario and Quebec may move in those courts to seek fees of up to 0.7% and 0.45%, respectively, of the Global Settlement consideration.  Lead Plaintiffs have obtained the right to appear before the courts in Ontario and Quebec to object to those fee applications, in the event Lead Plaintiffs determine that such objections are necessary to protect the Class' interests.  Lead Plaintiffs' Decl. ¶ 20.  Even if the courts in those Canadian actions were to grant in full the fee percentages set forth in the Notice, the total fee for all counsel would be 9.65%, which would still be 23% lower than the fee percentage permitted under the Retainer Agreement.

Significantly, the percentage-based fees requested here also are fair and reasonable when measured against fees awarded in other "mega-fund" cases.  In *Visa*, the Second Circuit affirmed a fee of 6.5% on settlements of $3.4 billion.  396 F.3d at 121.  And, in *WorldCom*, Judge Cote found that the approximately 5.5% in fees requested in conjunction with $6.1 billion in aggregate settlements to be fair and reasonable.  *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, (S.D.N.Y. 2005).  Courts in two cases with recoveries in the range of $1 billion awarded fees of approximately 14%.  *See In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 485-88 (S.D.N.Y. 1998) (Judge Sweet awarded a fee of $143 million, constituting 14% of the $1.027 billion recovery); *Shaw v. Toshiba America Information Systems, Inc.*, 91 F. Supp. 2d 942, 981 (E.D. Tex. 2000) (court approved a fee of $147.5 million, constituting over 14% of the value of that $2.1 billion settlement).  Indeed, in some cases that have resulted in settlements in the hundreds of millions of dollars, courts have awarded fees in the range of 25% of the recovery.[13]  When judged against these awards, the actual fee request of 8.5%, renegotiated downward from a Retainer Agreement after the results obtained were evaluated, is presumptively reasonable.  For these reasons, Lead Counsel respectfully submits that the Court should utilize the percentage method to determine the reasonableness of the requested fee, give due deference to the consent of Lead Plaintiffs to this request, and approve the present application as fair and reasonable.

---

[13]    *See, e.g., In re Lucent Technologies, Inc Sec. Litig.,*, 327 F. Supp. 2d 426 (D.N.J. 2004) (17% fee awarded on recovery of $517 million); *In re DaimlerChrysler AG Sec. Litig.*, No. 00-0993 (KAJ) (D. Del. Feb. 5, 2004) (22.5% fee awarded on recovery of $300 million); *In re Oxford Health Plans, Inc. Sec. Litig.*, 2003 U.S. Dist. Lexis 26795, MDL 1222 (S.D.N.Y. June 12, 2003) (28% fee awarded on recovery of $300 million); *see also Lucent*, 327 F. Supp. 2d at 439-41 (compiling cases).

### 2. The Requested Fees Are Reasonable as Measured by the *Grinnell* Factors

In determining a reasonable fee, the Second Circuit has advised courts to be guided by the traditional factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974). As summarized by the court in *Goldberger*, those factors include:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation … ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

209 F.3d at 50; *see also Bristol-Myers*, 361 F. Supp. 2d at 233.  Here, as shown below, each of these factors supports the fee request.

### a. The Time and Labor Expended by Counsel

The efforts expended by Plaintiffs' Counsel in the prosecution of the action have been extensive.  The Coffey Declaration sets forth the myriad tasks undertaken by Plaintiffs' Counsel, the time and labor expended, and the creativity of these efforts.  As set forth in greater detail in that Declaration (¶¶ 29-47), Lead Counsel, among other things:

- conducted an extensive pre-filing investigation, including interviewing thirty witnesses;

- filed the detailed First Amended Complaint;

- negotiated to have Defendants withdraw their three motions to dismiss the First Amended Complaint and, after Nortel answered the complaint, to commence discovery promptly;

- reviewed in a targeted manner approximately ten million pages of documents produced by Defendants and non-parties;

- filed the Second Amended Complaint, which re-named the Audit Committee Defendants, after reviewing documents produced in discovery;

- negotiated to have Defendants agree to not move to dismiss the Second Amended Complaint;

- moved for class certification; and

● sought leave to move for summary judgment on the basis of the documents obtained from Defendants;

The negotiation of the Settlement also required extensive efforts on the part of Lead Counsel. Coffey Decl. ¶¶ 48-57. Settlement discussions with Defendants and their insurance carriers as to the Global Settlement, and with OP Trust as to the allocation of that settlement between the Nortel I and Nortel II classes, spanned more than ten months. *Id.* From the outset, it was clear that Nortel lacked the financial wherewithal to independently fund an adequate cash settlement. At the same time, OP Trust was seeking to obtain a settlement from Nortel in Nortel I, and demanding the proceeds of insurance policies that might be in play for the Nortel II Action. Lead Counsel was therefore involved in multi-faceted settlement negotiations in which we sought to maximize (i) the allocation to Nortel II of the Global Settlement, including contributions from Nortel and its insurance carriers; (ii) Nortel's cash contribution to the Global Settlement; and (iii) the equity component to the Global Settlement to increase the Class's recovery without undermining Nortel's financial condition. *Id.* ¶ 2.

The number of hours Plaintiffs' Counsel expended (over 58,000 hours) attests to the extensive effort by all concerned. Coffey Decl. ¶ 75 and Exhibit 8 thereto. The cumulative lodestar of Lead Counsel and Plaintiffs Counsel is $17,429,370.30. *Id.* Plaintiffs' Counsel compiled the hours reported from contemporaneous time records maintained by each attorney and paraprofessional who participated in the prosecution of the Action. Coffey Decl. ¶ 74; *see also* Exhibit 8. The time and labor expended by counsel here amply supports the requested fees.

**b.**   **The Magnitude and Complexities of the Litigation**

This case is among the largest securities class actions in history, involved highly complex issues of law and fact and, significantly, presented daunting challenges pertaining to matters of insurance, a corporation's ability to pay a multi-billion dollar judgment, and interplay with a

larger, more procedurally advanced case competing for the same, limited assets.  The Action was brought against foreign defendants, with much of the critical evidence in the possession of non-parties or Nortel employees abroad who were not subject to U.S. discovery.  Lead Counsel's investigation, prosecution and settlement of this Action necessitated the involvement of a number of experts on complex corporate accounting, the telecommunications industry, executive compensation, damages and investment banking.  Coffey Decl. ¶¶ 29-43.  Before even completing discovery, Plaintiffs Counsel had reviewed roughly half of the over twenty million pages of documents that had been produced.  And given the hurdles presented by discovery of witnesses abroad under the Hague Convention, Lead Counsel had yet to obtain documents from several important non-parties, such as Nortel's auditor.  *Id.* ¶ 88.  The magnitude and complexity of this litigation also fully supports approval of the requested attorneys' fees.

      **c.**      **The Risks of the Litigation**

As the Second Circuit recognized in *Grinnell*, "despite the most vigorous and competent of efforts, success is never guaranteed."  495 F.2d at 471.  Federal courts have long recognized that securities class action litigation "is notably difficult and notoriously uncertain."  *Sumitomo*, 189 F.R.D. at 281 (citation omitted).  The high caliber of plaintiffs' counsel and their aggressive pursuit of a case provides no assurance that they will prevail on summary judgment, at trial, or achieve a satisfactory settlement or any settlement at all.  This is confirmed by the risks that Plaintiffs' Counsel assumed in commencing and prosecuting this Action.

This Action presented risks that went beyond those customarily faced in securities class actions.  Nortel's precarious financial condition presented the substantial risk that the Company would be unable to satisfy a multi-billion dollar judgment or meaningfully contribute to a cash settlement.  This risk existed from the outset of the Action, and was heightened by the pendency of Nortel I, which as noted above, was competing for the same limited pool of Nortel assets and

asserting priority on certain insurance proceeds (as to which the carriers were in any event resisting payment).   That "ability to pay" risk was prevalent in *Lucent*, where, as here, the corporate defendant's financial condition was precarious and deteriorating, and it demanded a "global settlement" of other Lucent-related lawsuits.   327 F. Supp. 2d at 438.   Judge Pisano recognized that "[a] truly grave possibility of non-payment was the impetus for the settlement negotiations," and found that the excellent settlement achieved in the face of this heightened risk substantially supported the Court's approval of the 17% fee requested there.   *See id.*

Further, as also noted above, Defendants and key witnesses are foreign.   Lead Counsel faced the risk that Defendants might demonstrate that the Court lacked subject matter jurisdiction over the claims of a substantial portion of the Class, those who were non-U.S. citizens who transacted in Nortel securities on the TSE.   The result of this fact-specific determination, which depends upon the nature of the Defendants' allegedly fraudulent conduct within the U.S. and whether that conduct caused the losses, *see Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452, 480 (S.D.N.Y. 2001) ("A federal court has subject matter jurisdiction under the conduct test 'if (1) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States "directly caused" the claimed losses."), was anything but assured, *see, e.g., Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (S.D.N.Y. 1975) (directing the district court to "eliminate from the class action all purchasers other than persons who were residents or citizens of the United States"); *see, generally, e.g., In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,* No. MDL 1500, 02 Civ. 5575(SWK), 2006 WL 903236, at *12 (S.D.N.Y. Apr. 6, 2006) (risk of succeeding in certifying class supported approval of settlement); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 460 (S.D.N.Y. 2004) (same).

In addition, critical evidence, such as that possessed by Nortel's Canadian audit firm or its current and former employees located abroad, was not accessible to Lead Counsel through traditional discovery.[14]   Rather, Lead Counsel could only seek such discovery through the issuance of letters rogatory, a far less efficient or productive method of discovery than that available under the Federal Rules.   Indeed, while Lead Counsel succeeded in obtaining over twenty million pages of documents from Defendants and from non-parties located in the U.S., despite the issuance of letters rogatory Lead Counsel had not, as of the time the settlement agreement was reached, obtained discovery from foreign non-parties.  *See Berlinsky v. Alcatel Alsthom Compagnie Generale D'Electricite*, 964 F. Supp. 754, 755 (S.D.N.Y. 1997) (in approving securities class action settlement, court found "most important" that, because defendant was a foreign entity, settlement avoided, among other things, expensive and complicated discovery).

In light of the risks present in this litigation, the prospects of any recovery, let alone a large recovery, were hardly assured.   As a result, the risks of non-payment for Plaintiffs' Counsel, who agreed to prosecute this Action solely on a contingency basis, were significant from the outset of the Action and throughout the case, and support the reasonableness of the requested fees.  *See Lucent*, 327 F. Supp. 2d at 438 (the heightened risk of non-payment "where counsel accepts a case on a contingent basis," was "enhanced" given Lucent's precarious financial condition, and, therefore supported the fee award).

---

[14]      While current Nortel employees who are officers, directors or managing agents of the Company may be deposed under the Federal Rules, current employees who possess relevant information but are nonetheless not deemed to be officers, directors or managing agents would not be subject to deposition absent a subpoena.  *See, e.g., U.S. v. Afram Lines (USA), Ltd.*, 159 F.R.D. 408, 413 (S.D.N.Y. 1994).

### d.      Quality of Representation

The fourth criterion for evaluating the fee request is the quality of the representation of the Class.[15]  In most cases, the best evidence of the quality of class counsel's representation of a class is the outstanding results achieved.  *See WorldCom*, 388 F. Supp. 2d at 357-58 (evaluating quality of representation by reference to the substantial risks faced by counsel, which "obtained remarkable settlements for the Class while facing formidable opposing counsel from some of the best defense firms in the country"); *Lucent*, 327 F. Supp. 2d at 427 ("the result itself evidences counsel's skill and efficiency").  As described immediately below and in the Coffey Declaration, Lead Counsel's innovative, aggressive and efficient prosecution of this Action resulted in one of the largest securities class action recoveries in U.S. history.

In the face of a foreign corporate defendant in precarious and deteriorating financial condition, the existing Nortel I action, and wasting insurance polices the majority of which did not necessarily cover the claims asserted in Nortel II, Lead Counsel structured a Settlement to obtain (i) as much of Nortel's assets as was possible without jeopardizing the Company's ability to regain its stature, (ii) substantially all of the available insurance coverage, (iii) as much equity for the Class as Nortel reasonably could issue, and (iii) a favorable allocation of the Global Settlement.  Lead Counsel accomplished this result by aggressively prosecuting the Action and employing innovative strategies to streamline and accelerate it, such as using a targeted review of the Company's documents, having Defendants withdraw their motions to dismiss the First Amended Complaint and agree not to move to dismiss the Second Amended Complaint, and seeking leave to move for summary judgment on the Class's Section 10(b) claim against Nortel. Lead Counsel also employed investment bankers to make sure that they and Lead Plaintiffs

---

[15]      The firm resumes of Lead Counsel and Plaintiffs' Counsel, which demonstrate their background and experience, are being submitted in support of the Fee and Expense Application.

completely understood Nortel's current and projected financial condition, and how best to structure the equity component of the Global Settlement such that the Class would obtain the most benefit while not causing the dilutive effect to unduly harm Nortel's share value.

It was this sort of novel prosecution and negotiation strategy that was lauded by the courts in *Lucent* and *WorldCom*. In *Lucent*, a case with many parallels to this one, Judge Pisano noted Lucent's precarious financial condition and its demand to settle only if it also settled other related cases, and then praised counsel for "investigating closely with their experts to learn the true limits and constraints on any possible settlement," which resulted in a settlement that "maximized the recovery for the Class and permitted Lucent to continue its operations and efforts towards regaining financial progress." 327 F. Supp. 2d at 436. The *Lucent* court also praised lead counsel for obtaining a substantial global settlement, and then negotiating with counsel in the related cases to obtain for the class a very favorable allocation of that global settlement. *See id.*; *WorldCom*, 388 F. Supp. 2d at 358 ("The Lead Counsel firms also performed excellently on behalf of the Class in settlement negotiations. . . . Lead Counsel have proven themselves adept at working with other counsel representing clients with varying, sometimes competing interests in the settlement context as well."). And, as was the case here, Judge Pisano noted that lead counsel did not piggyback on the investigation performed by the SEC or other regulatory agencies. *See Lucent*, 327 F. Supp. 2d at 436-37. ("Though an SEC investigation concerning Lucent was ongoing, it neither prompted this litigation nor assisted Common Shareholders Lead Counsel in handling this matter."); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (the skill and efficiency of counsel and the successful resulted "in a litigation that was far ahead of public agencies like the Securities and Exchange

Commission and the United States Department of Justice, which long after the institution of this litigation awakened to the concerns that plaintiffs' counsel first identified").

Judges Cote and Pisano both also noted that in the cases before them, as here, "Lead Counsel obtained remarkable settlements for the Class while facing formidable opposing counsel from some of the best defense firms in the country."  *WorldCom*, 388 F. Supp. 2d at 357-58; *accord Lucent*, 327 F. Supp. 2d at 437 ("The fact that Common Shareholders Lead Counsel for the Plaintiffs obtained a favorable settlement from parties represented by awesome adversaries underscores the quality of their representation.").  Judge Sweet, who served as settlement judge in *WorldCom* and was the Court-appointed mediator of the Global Settlement here, noted in *In re NASDAQ Market-Makers Antitrust Litigation* that:

> The quality of opposing counsel is . . . significant in considering the quality of services rendered by plaintiff's counsel, as measured by the result achieved. . . . The ability of Class Counsel to obtain record-breaking settlements in the face of a stubborn and well executed defense further evidences the excellent quality of petitioners' work.

187 F.R.D. 465, 488 (S.D.N.Y. 1998)[16]

### e.     The Results Achieved Justify the Requested Fee

The total recovery achieved in this Action is one of the largest in the history of federal securities class action litigation.  Those results speak for themselves.  They were obtained in the face of the many complexities and risks discussed above, and in the Coffey Declaration and the Lead Plaintiffs' Declaration – in particular, Defendants' uncertain ability to pay. Notwithstanding those risks and complexities, Plaintiffs' Counsel obtained an outstanding

---

[16]     Further, Plaintiffs' Counsel aggressively and efficiently prosecuted this Action without piggybacking on any governmental investigation.  *See In re Lucent Technologies, Inc., Sec. Litig.*, 327 F. Supp. 2d 426, 444 (D.N.J. 2004) (noting that lead counsel did not rely on any prior action brought by a governmental agency, that they financed the costs of the action for years, and that Lucent's solvency was uncertain throughout the litigation).

recovery for the Class by aggressively and innovatively prosecuting the Action. The exceptional recovery for the Class includes the following components:

- Even though the estimated recoverable damages in Nortel I were substantially greater than those in Nortel II, Plaintiffs' Counsel achieved a 50% allocation for Nortel II of any cash or common stock Nortel would contribute to a global settlement;

- Even though the insurance coverage for the claims asserted in Nortel I was substantially greater than the insurance coverage for the claims in Nortel II, Plaintiffs' Counsel, as a result of an innovative coverage theory developed by insurance law experts at Lowenstein, achieved an allocation with Nortel I whereby Nortel II recovered $66,495,000 of insurance proceeds from the policies presumed to cover only Nortel I;

- A $580 million global cash contribution from Nortel (plus 50% of any amounts Nortel may recover in its prosecution against certain former senior employees), which, based on the evaluation of Lead Plaintiffs' investment banking experts, constituted a substantial portion of the cash the Company had available (*see* Light/Mullin Declaration at ¶¶ 31-33, 45-49);

- A global equity contribution of an unprecedented 14.5% of Nortel's outstanding common stock;

- A total global recovery that constituted over 28% of the recoverable damages estimated by Lead Plaintiffs' damages expert, and 70% of recoverable damages under a typical "defendant style" calculation (*see* Preston Aff. at ¶¶ 20-21); and

- Substantial corporate governance improvements, which are particularly relevant in light of the fact that Class Members will now own substantial amounts of Nortel common stock.

As noted, the financial ability of Defendants made obtaining any greater recovery from them highly unlikely. Lead Plaintiffs and Lead Counsel, with their expert advisors, reviewed Nortel's current and projected financial condition and the limits of insurance available. Coffey Decl. ¶¶ 51-54; Lead Plaintiffs' Decl. ¶ 14. The contribution by Nortel's insurance carriers constitutes a significant component of the cash component of the Settlement. That component would likely not have been available to satisfy a judgment in light of Nortel I, which laid claim

27

to a substantial amount of the insurance proceeds, and in light of the fact that those insurance policies were being used to fund defense costs in both Nortel I and Nortel II.  Finally, the equity component of the Settlement achieved as a result of Lead Plaintiffs' and Lead Counsel's extensive negotiations would likely not have been available to satisfy a judgment in this Action. Given these factors, the Settlement represents truly excellent results.

### f.    Public Policy Considerations Support the Requested Fee

As numerous courts and observes have noted, the PSLRA favors the appointment of institutions as lead plaintiffs.  *See*, *e.g.*, *WorldCom*, 2004 WL 2591402, at \*19.  Ontario Teachers and New Jersey are sophisticated institutional investors that are experienced serving as lead plaintiffs in complex securities class actions.  *Id.*  Lead Plaintiffs, which between them lost tens of millions of dollars, have been diligent in their supervision of and participation in the Lead Counsel's prosecution and mediation of this case, which included direct supervision of Lead Counsel's preparation of key pleadings, correspondence with the Court, and negotiations with Defendants, the carriers and OP Trust.  *See* Lead Plaintiffs' Decl. ¶¶ 2-15.  Here, as in *WorldCom*, Lead Plaintiffs "conscientiously supervised the work of Lead Counsel and give[] [their] endorsement to the fee request," which is 32% lower than permitted under the Retainer Agreement.  *See WorldCom* at \*19.  Therefore, "the requested fee is entitled to a presumption of reasonableness."  *Id.*  Indeed, as discussed above, the success public pension fund lead plaintiffs have demonstrated in reducing fee awards in securities class actions warrants not only giving deference to the fee agreements negotiated by such lead plaintiffs, but to adopting similar fee structures in cases where a public pension fund does not serve as lead plaintiff.

Moreover, private lawsuits such as this serve to further the objective of the federal securities laws to protect investors and consumers against fraud and other deceptive practices. As Judge Cote observed in *WorldCom*:

> Public policy also supports the approval of this fee request. The size of the recovery achieved for the class – which has been praised even by several objectors – could not have been achieved without the unwavering commitment of Lead Counsel to this litigation. . . . If the Lead Plaintiff had been represented by less tenacious and competent counsel, it is by no means clear that it would have achieved the success it did here on behalf of the Class. In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives. After all, this litigation was conducted on an entirely contingent fee basis, and Lead Counsel paid millions of dollars to fund the litigation. While some significant recovery in a case of this magnitude may seem a foregone conclusion now, the recovery achieved here was never certain. It is only the size of the Citigroup and Underwriters' Settlements that make this recovery so historic, and it is likely that less able plaintiffs' counsel would have achieved far less.

388 F. Supp. 2d at 359. For the majority of Class Members, this class action was their only hope of obtaining compensation for the losses they suffered as a result of the fraud at Nortel. A class action was the most efficient manner in which to prosecute those claims. In this circumstance, "[p]rivate attorneys should be encouraged to take the risks required to represent those who would not otherwise be protected from socially undesirable activities like securities fraud." *Del Global,* 186 F. Supp. 2d at 374.

### 3. The Lodestar Cross-Check

The Second Circuit has encouraged the practice of performing a lodestar "cross-check" on the reasonableness of a fee award based on the percentage approach. The lodestar is calculated by multiplying the number of hours expended on the entire litigation by a particular attorney by his or her current hourly rate. The lodestar multiplier enhances the lodestar figure "by an appropriate multiplier to reflect litigation risk, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 466 (S.D.N.Y. 2004).[17] The lodestar here, through

---

[17] The hourly billing rate to be applied is the hourly rate that is normally charged in the community where the counsel practices, *i.e.*, the "market rate." *See Blum*, 465 U.S. at 895;

August 31, 2006, was $17,429,370.30. Coffey Decl. ¶ 75. This represents 58,768.86 hours

expended by attorneys and paraprofessionals – a prodigious effort – during the nearly two years

of litigation in this case. *Id.*[18] The requested fee would represent a multiplier of 5.07. *Id.*

        In performing a lodestar cross check, courts must be mindful that, while the percentage

method "directly aligns the interests of the class and its counsel and provides a powerful

incentive for the efficient prosecution and early resolution of litigation," the lodestar approach

creates a "disincentive to early settlements [by] tempting] lawyers to run up their hours." *Wal-*

*Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, (2d Cir. 2005) (quotations omitted). Thus,

too much emphasis on the cross check may penalize counsel for innovative, efficient and

aggressive prosecution that puts an outstanding recovery in the hands of class members without

wasting time and running up needless hours and costs. *See Faircloth v. Certified Finance Inc.*,

No. Civ. A. 99-3097, 2001 WL 527489, at *10 n.3 (E.D. La. May 16, 2001) (emphasizing the

lodestar "would undermine the utility of the percentage fee method"). In *Schwartz v. TXU*

*Corp.*, in which lead counsel obtained an outstanding recovery at an early stage of the litigation

"without the substantial expense, risk and delay of continued litigation," the court warned that

"the fact that the time involved is less than if the cases had unnecessarily dragged on for years

should not diminish the percentage to be awarded. To the contrary, such efficiency and

_____

Hensley v. Eckerhart, 461 U.S. 424, 447 (1983) (Brennan, J., concurring in part, dissenting in part) ("market standards should prevail"); *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997) ("[t]he 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation'" (citing *Blum*, 465 U.S. at 896 n.11)). In addition, the Supreme Court and other courts have held that the use of *current* rates is proper since such rates more adequately compensate for inflation and loss of use of funds. *Missouri v. Jenkins*, 491 U.S. 274, 283-284 (1989); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1153 (2d Cir. 1983) (use of current rates appropriate where services were provided within two to three years of fee application).

[18]     Plaintiffs' Counsel compiled the hours reported from contemporaneous time records maintained by each attorney and paraprofessional affiliated with the firms that participated in the Action. *See* Coffey Decl. ¶ 74.

effectiveness should be rewarded and the percentage method accomplishes this result." Nos. 3:02-CV-2243-K, *et al.*, 2005 WL 3148350, at *29 (N.D. Tex. Nov. 8, 2005).  And in *In re Harrah's Entm't Sec. Litig.*, the court noted that "[t]o unduly emphasize the amount of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and would distort the value of the attorneys' services."  No. 95-2935, 1998 WL 832574, at *5 (E.D. La. Nov. 25, 1998); *Di Giacomo v. Plains All American Pipeline*, No. Civ.A.H-99-4137, 2001 WL 34633373, at *11 (S.D. Fla. Dec. 19, 2001) (same, citing *Harrah's*).  Indeed, as the court pointed out in *In re Charter Communications, Inc. Securities Litigation*:

> Had the case not been settled, considerably more time would have been necessary to complete formal discovery (particularly of third parties) and to prepare this case for trial with no assurance that the outcome would have been any more successful.  Indeed, given Charter's precarious financial condition, there was a risk that the continued pendency of this lawsuit would preclude the Company from renegotiating its credit lines.  Further litigation would have diminished the considerable insurance policies that were paying defendants' counsels' fees.

No. MDL 1506, 4:02-CV-1186 CAS, 2005 WL 4045741, at *18 (E.D. Mo. June 30, 2005).

While the number of hours expended by Plaintiffs' Counsel is large, Lead Counsel respectfully submits that, given the size and complexity of this Action and the Global Settlement, it could have been much larger – perhaps several times larger – but for counsel's creative and focused efforts to bring about a resolution as quickly, and successfully, as possible.  The examples of ways in which Lead Counsel saved time and resources are numerous:  persuading Defendants to withdraw their motions to dismiss the First Amended Complaint; obtaining Defendants' agreement not to move to dismiss the Second Amended Complaint; developing a plan to prioritize the review of Nortel's documents in order to postpone (and if settlement were achieved, to eliminate entirely) the time-consuming analysis of half of the twenty million pages of documents produced by the Company; and when settlement (and allocation) discussions needed a boost, by seeking leave to move for summary judgment.

31

This approach resulted in an outstanding recovery for the Class now, rather than obtaining the same, or a lesser, or perhaps no recovery after incurring massive amounts of time and resources and jeopardizing Nortel's survival.  Given Nortel's limited financial wherewithal and the wasting nature of its insurance policies, Lead Counsel maximized the Class's recovery. Accordingly, a lodestar multiplier of 5.07 is justified here, and is within the range found to be reasonable by courts that have used lodestar cross checks in complex class actions with outstanding results in the face of substantial risks.  *See, e.g., Charter Comms.,* 2005 WL 4045741, at *18 (finding that a multiplier of 5.61 "falls within the range of multipliers found reasonable for cross-check purposes by courts in other similar actions, and is fully justified here given the effort required, the hurdles faced and overcome, and the results achieved"); *In re Rite Aid Corp. Sec. Litig.*, MDL No. 1360, 2005 WL 697461 at *2-3 (E.D. Pa. Mar. 24, 2005) (multiplier of 6.96); *In re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litig.* 364 F. Supp. 2d 980 (D. Minn. 2005) (multiplier of 4.7); *In re Cendant Corp. Prides Litig.*, 51 F.Supp.2d 537 (D.N.J. 1999), *vacated and remanded*, 243 F.3d 722 (3d Cir.2001), *on remand*, No. 98-2819 (D.N.J. June 11, 2002) (multiplier of 5.28); *Di Giacomo v. Plains All Am. Pipeline*, Nos. H-99-4137, H-99-4212, 2001 WL 3463337 at *10 (S.D. Tex. Dec. 18, 2001) (multiplier of 5.3); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5).[19]  Thus, the "cross-check" confirms the reasonableness of the percentage sought here.

---

[19]      Lodestar multipliers of nearly 5 have been deemed "common" by courts in this District. *See In re NASDAQ*, 187 F.R.D. at 489 (Judge Sweet approving fee representing 14% of $1.027 billion settlement representing a multiplier of 3.97, and noting that lodestar multiples of between 3 and 4.5 are common); *In re Sumintomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (awarding a 27.5% fee and finding multipliers of 3 to 4.5 to be common); *Del Global*, 186 F.Supp.2d at 371 (approving 33% of the recovery representing a multiplier of 4.65).

**B.      Plaintiffs' Counsel Should Be Reimbursed For Expenses**
         **Reasonably Incurred In Connection With This Action**

Reimbursement of expenses to counsel to create a common fund is appropriate. *See In re Arakis Energy Corp., Sec. Litig.*, No. 95 CV 3431, 2001 WL 1590512, at *17 n.12 (E.D.N.Y. Oct. 31, 2001) ("Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course"); *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 842 F. Supp. 733, 746 (S.D.N.Y. 1994); *Miltland Raleigh-Durham v. Myers*, 840 F. Supp. 235, 239 (S.D.N.Y. 1993) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they 'were incidental and necessary to the representation' of those clients") (citation omitted).

The Coffey Declaration ¶¶ 92-103 summarizes that Lead Counsel and the law firms that assisted in this Action incurred $3 million in "reimbursable" expenses on behalf of the Class in the prosecution of the Action. Such expenses were essential to the successful prosecution and resolution of this Action. Lead Plaintiffs reviewed the expenses incurred by Lead Counsel and approve the request for reimbursement.

Some of the expenses for which counsel seek reimbursement were paid out of a Litigation Fund contributed to by Lead Counsel and Lowenstein, which was maintained by Lead Counsel. A full accounting of the payments to and expenditures by the Litigation Fund is set forth in the Exhibit 8 to the Coffey Declaration, and Lead Counsel is prepared to provide any additional documentation requested by the Court.

As noted in the Coffey Declaration (¶¶ 96-99), Lead Plaintiffs have incurred considerable expenses for experts and consultants retained by Lead Counsel. In addition, Lead Counsel incurred substantial expense to create and maintain the electronic database necessary to facilitate

the review of the roughly 20 million pages of documents produced in this litigation.   Coffey Decl. ¶ 100.

In addition, Lead Plaintiffs are entitled to reimbursement of the $39,264.25 ($21,054.84 for Ontario Teachers, and $18,209.41 for New Jersey) of "reasonable costs and expenses (including lost wages) directly relating to the representation of the class."   15 U.S.C. § 78u-4(a)(4).   Lead Plaintiffs calculated their costs incurred for the time they spent directly relating to their representation of the Class, and the out-of-pocket expenses were incurred by Lead Plaintiffs for the benefit of the Class.   Lead Plaintiffs' Decl. ¶ 22.   As described in the Lead Plaintiffs' Declaration, Lead Plaintiffs reviewed pleadings, motions and significant correspondence, frequently communicated with counsel and with executives at their respective institutions, substantially participated and in attended mediation and related sessions, and attended district court hearings.   Courts have awarded class representatives similar costs and expenses when the requests have been disclosed in the Notice (the Notice disclosed that Lead Plaintiffs each would seek reimbursement of up to $30,000), there have been no objections thereto, and the request is supported by detailed declarations as is the case here.   *See, e.g., In re BankAmerica Corp. Sec. Litig.,* 228 F. Supp. 2d 1061, 1067 (E.D. Mo. 2002) (awarding reimbursement to lead plaintiff of reasonable costs that were disclosed in the notice of settlement).

Lead Counsel respectfully submits that all of the foregoing reimbursement requests are appropriate, fair and reasonable, and should be approved.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, Lead Plaintiffs respectfully request that this Court approve as fair and reasonable to the Class Lead Counsel's application for attorneys' fees and reimbursement of litigation expenses.

Dated: New York, New York
       September 5, 2006

Respectfully Submitted,


  /s/  John P. Coffey

Max W. Berger (MB-5010)
John P. Coffey (JC-3832)
Jeffrey N. Leibell (JL-1356)
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400
